**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY H. WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12-cv-04039** |
| | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant,** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant, Ms. Mary H. White, seeks judicial review of a final decision of the Commissioner

of the Social Security Administration ("SSA") denying her application for widow's disability

benefits under the Social Security Act ("the Act"). Ms. White has filed a motion for summary

judgment, seeking to reverse the Commissioner's final decision or remand the case for consideration

of the issues raised herein. The Commissioner has filed a cross motion for summary judgment

seeking to affirm the Commissioner's final decision. For the reasons set forth below, Ms. White's

motion to remand is denied [dkt. 14], and the Commissioner's motion to affirm is granted [dkt. 22].

I.      **Procedural History**

Ms. White applied for disabled widow's benefits on July 9, 2010, alleging that she became

disabled on January 1, 2010.[1] Her claim was denied initially on February 28, 2011, and again upon

reconsideration on May 27, 2011.[2] On June 22, 2011, Ms. White requested a hearing before an

Administrative Law Judge ("ALJ").[3] A hearing presided over by ALJ Patricia A. Bucci was held on

---

[1] R. at 24.
[2] *Id.*
[3] *Id.*

November 7, 2011 in Chicago, Illinois.[4] Following the hearing, the ALJ issued an unfavorable

decision on November 30, 2011, concluding that Ms. White was not disabled under section 202(e)

of the Act.[5] The Appeals Council denied Ms. White's request to review the ALJ's decision, so the

ALJ's decision is the final decision of the Commissioner.[6]

## II.    Factual Background

The facts set forth in this section are derived from the administrative record. We begin with

an overview of Ms. White's background and relevant medical history. We then summarize the ALJ

hearing testimony and the ALJ's decision.

### A.    Ms. White's Background and Relevant Medical History

Ms. White was born December 18, 1957, and was fifty-three years old at the time of the

hearing on November 7, 2011.[7] In her application for benefits, Ms. White listed that she was most

recently employed as a bus monitor and worked in that position from October 2008 until the end of

July 2010.[8] She listed that prior to that she worked as a machine operator at a mailing company from

1993-2008.[9] However, more positions were listed on her work history report for the SSA, spanning

from 1976 to 2009.[10] These positions included work as a cashier and cook at a restaurant, work as

a nurse's aid and janitor at a hospital, work as a cook and supervisor at a nursing home, and a few

others.[11]

---

[4] *Id.*
[5] R. at 25.
[6] R. at 1-3.
[7] R. at 51.
[8] R. at 188.
[9] *Id.*
[10] R. at 214.
[11] *Id.*

The chronology of Ms. White's medical record is relatively short, so we will examine the record based on dates of treatment and physician visits. The available medical records for Ms. White begin on August 27, 2010 when she was seen by her treating physician, Muhammad Rafiq, M.D. at Oak Forest Hospital of Cook County.[12] Ms. White testified during the hearing that she has been treated by Dr. Rafiq since 1995 or 1997.[13] On August 27 she complained of left-sided chest pain.[14] Ms. White's hypertension, or abnormally high blood pressure,[15] was described as controlled.[16] Dr. Rafiq stated that Ms. White had a history of asthma, osteoarthritis (the degeneration of joint cartilage and the underlying bone),[17] and ulcerative colitis (a chronic inflammatory disease of the large intestine and rectum characterized by recurrent episodes of abdominal pain, fever, chills, and diarrhea).[18] Some lab work was done on September 9, 2010, and Ms. White was seen in October of 2010 for a medicine refill.[19]

The record shows that the next time Ms. White visited a physician was when she saw Dr. Rafiq on January 21, 2011.[20] She complained of having lower back pain for a few days.[21] Dr. Rafiq formally diagnosed ulcerative colitis, unspecified osteoarthritis, benign and controlled

---

[12] R. at 266.
[13] R. at 60.
[14] R. at 268.
[15] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/cardiovascular_disorders/hypertension/overview_of_hypertension.html?qt=hypertension&alt=sh (2013).
[16] *Id.*
[17] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/musculoskeletal_and_connective_tissue_disorders/joint_disorders/osteoarthritis_oa.html?qt=osteoarthritis&alt=sh (2013).
[18] *Id.*; The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/gastrointestinal_disorders/inflammatory_bowel_disease_ibd/ulcerative_colitis.html?qt=ulcerative%20colitis&alt=sh (2013).
[19] R. at 27, 270-72.
[20] R. at 256-58.
[21] R. at 256.

hypertension, hyperlipidemia (an abnormally high concentration of fats or lipids in the blood),[22] and unspecified stable asthma.[23] Dr. Rafiq's notes from this visit state that Ms. White had been on medication for hypertension for more than ten years, though the specific medication is not noted.[24]

On January 27, 2011, consulting internist M.S. Patil, M.D. examined Ms. White for the purpose of determining disability.[25] At the time, Ms. White was sixty-seven inches tall, weighed 177 pounds, and had a blood pressure of 124/74.[26] Dr. Patil noted that Ms. White had complained of arthritis in her back for many years, as well as occasional pain in her hips, knees, hands, and feet.[27] She complained of mild pain and difficulty with bending, lifting more than ten pounds, carrying heavy objects, and standing or walking for more than ten minutes.[28] The notes also state that the pain radiated to her legs, and she sometimes had pain even when sitting.[29] Ms. White indicated to Dr. Patil that the pain level in her back was an 8/10, and she stated that physical therapy in the past had not been helpful.[30] She denied having any major back injury or surgery.[31] As part of the mental examination Dr. Patil found that Ms. White was mildly anxious, but noted there were no other issues.[32]

---

[22] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/endocrine_and_metabolic_disorders/lipid_disorders/dyslipidemia.html?qt=hyperlipidemia&alt=sh (2012).
[23] R. at 256.
[24] Id.
[25] R. at 274-77.
[26] Id.
[27] R. at 274.
[28] Id.
[29] Id.
[30] Id.
[31] Id.
[32] R. at 275.

Ms. White told Dr. Patil that she had been on medication for hypertension for more than ten years and that she used an inhaler as needed for asthma.[33] Dr. Patil's examination stated that Ms. White's gait was normal, her lungs were clear, and she did not complain of tenderness or spasm in the muscles on either side of the midline of the spine.[34] The exam notes also state that Ms. White had a limited range of motion of the lumbar spine.[35] An x-ray of Ms. White's lumbosacral spine revealed a slight disc space narrowing at the L4/5 vertebrae.[36] Dr. Patil concluded by affirming Dr. Rafiq's previous diagnoses of ulcerative colitis, osteoarthritis, hypertension, and asthma.[37] In addition, Dr. Patil diagnosed Ms. White with varicose veins which gave her pain while sitting.[38] Dr. Patil also noted that Ms. White consults Dr. Rafiq regularly.[39]

On February 22, 2011, a non-examining state agency physician, Virgilio Pilapil, M.D., conducted a residual functional capacity assessment on behalf of the SSA based on Ms. White's records.[40] The physician's notes state that Ms. White's exertional and postural activities are limited by arthritis in her lumbar spine, coupled with a decreased range of motion and complaints of pain.[41] Dr. Pilapil's primary diagnosis of Ms. White was arthritis in her lumbar spine.[42] According to this assessment, Ms. White can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, and sit about six hours of an eight hour workday.[43] However, when sitting, Ms.

---

[33] R. at 274.
[34] R. at 276.
[35] Id.
[36] R. at 277.
[37] Id.
[38] Id.
[39] Id.
[40] R. at 279-86.
[41] R. at 280.
[42] R. at 279.
[43] R. at 280.

White must periodically alternate from sitting to standing in order to relieve pain or discomfort.[44] Dr. Pilapil found that Ms. White has unlimited ability to push and/or pull.[45] The assessment limits Ms. White in terms of posture by establishing that she should only occasionally climb ramps or stairs and ladders, rope, or scaffolding.[46] Ms. White's asthma is listed as a secondary diagnosis.[47] Dr. Pilapil also noted two environmental limitations based on Ms. White's well-controlled asthma. The assessment states that Ms. White should avoid concentrated exposure to both extreme cold and respiratory irritants such as "fumes, odors, dusts, gases, poor ventilation, etc."[48] Finally, Dr. Pilapil wrote that Ms. White's statements about her degree of back, hand and leg pain were not supported by the evidence and were only partially credible.[49]

On March 16, 2011 Ms. White was seen for a laceration at Oak Forest Triage with no abnormalities reported and no additional information provided.[50] Ms. White was seen by Dr. Rafiq on April 25 for a routine visit, May 23 for a routine pap smear, and July 29 for a routine visit.[51] No specific abnormalities were reported and she was in no acute distress.[52]

On August 1, 2011, Ms. White was seen again by her treating physician, Dr. Rafiq.[53] Dr. Rafiq's notes indicate that Ms. White was seen that day in order to file a Social Security Disability form.[54] Dr. Rafiq's notes state that Ms. White experienced mild tenderness over her lumbosacaral spine, that straight leg raising was negative bilaterally, and that she possessed a

---

[44] *Id.*
[45] *Id.*
[46] R. at 281.
[47] R. at 279.
[48] R. at 283.
[49] R. at 284.
[50] R. at 312-15.
[51] R. at 304-09, 322-27.
[52] *Id.*
[53] R at 302.
[54] R. at 301-03.

normal range of motion.[55] Ms. White was alert, oriented, and experienced no acute distress.[56] Her hypertension was described as controlled, and her asthma was described as stable.[36]

In his disability assessment, Dr. Rafiq concluded that Ms. White could lift eleven to twenty pounds occasionally and six to ten pounds frequently, stand or walk less than four hours of an eight-hour workday, and sit less than four hours of an eight-hour workday.[57] He also noted that Ms. White could occasionally engage in most postural activities, but should never climb ladders or ropes.[58] Dr. Rafiq further stated that Ms. White did not have any significant cognitive or mental limitations that he was aware of.[59] Dr. Rafiq's notes include minimal explanation for these conclusions other than that his findings were based on his previous diagnoses of hypertension, hyperlipidemia, osteoarthritis, asthma, and ulcerative colitis.[60]

There was some confusion about the records from ChiroMed Health & Wellness Center regarding whether Ms. White or a chiropractor had filled out various pieces of paperwork. A physician evaluation and treatment plan dated September 26, 2011, apparently filled out by a chiropractor, indicates a diagnosis of lower back pain and pain in the cervical spine.[61] It should be noted that the signing chiropractor's signature is not legible and is lacking the initials "D.C." which led the ALJ to appear skeptical of its origin.[62] The treatment plan recommended visits several times per week for four weeks for therapy, manipulation, and other treatment.[63]

---

[55] R. at 302.
[56] *Id.*
[57] R. at 297.
[58] *Id.*
[59] *Id.*
[60] R. at 298.
[61] R. at 342-49.
[62] R. at 28, 342.
[63] R. at 342.

There is also a report that recommended Ms. White visit three times per week and indicated the chiropractor thought Ms. White's spinal arthritis was in Phase 2.[64] The report is followed by a patient history form that Ms. White contends the chiropractor filled out.[65] Finally, there is a self-evaluation form filled out by Ms. White.[66] Ms. White recorded that she believed she had limited ability to perform self-care, an occupation, social activities, and life-support activities.[67]

Ms. White was seen again by Dr. Rafiq on October 28, 2011 for a follow up of her hypertension, dyslipidemia, and asthma.[68] Her hypertension was described as benign, and no other limitations were noted.[69]

### B. The Hearing Before The ALJ

Ms. White's hearing before the ALJ occurred on November 7, 2011 in Chicago, Illinois.[70] We will first look at Ms. White's testimony and then the testimony of the vocational expert ("VE").

### 1. Ms. White's Testimony

To begin the hearing, Ms. White's attorney, John Horn, stated that Ms. White recently went to the chiropractor and he entered into evidence some x-ray films taken during that appointment.[71] Ms. White testified that she was born on December 18, 1957 and that she is educated through the twelfth grade, with some college.[72] She stated that she lives with her twenty-four year old daughter and her two grandchildren, aged eighteen months and two months.[73] Ms. White testified that her

---

[64] R. at 343.
[65] R. at 344-47.
[66] R. at 348-49.
[67] R. at 349.
[68] R at 350.
[69] R. at 351.
[70] R. at 48.
[71] R. at 50.
[72] R. at 51-52.
[73] R. at 52.

daughter worked at a daycare center, but is not currently working due to the recent birth of her child.[74] Her daughter is collecting unemployment until she returns to work.[75]

Ms. White stated that she drives, but not very far, typically only to the store.[76] She testified that she had not worked since she quit her part-time job in either September or October of 2010, and that she stopped working due to her back problems and colitis.[77]

The ALJ asked Ms. White what kind of medication she was taking for her pain and other medical problems.[78] Ms. White explained that she was taking tramadol for pain, and albuterol for asthma.[79] She stated that she takes all of her medications three times per day.[80] Ms. White testified that her last asthma attack was in September, and that she did not go to the emergency room for treatment.[81] When the ALJ asked Ms. White about her pain, she replied that she has constant pain in her back on both sides and in the lower portion of her back.[82] She continued, stating that she does not get much sleep at night—sometimes only four to five hours—because she is in constant pain.[83] Ms. White stated that sometimes she is up all night in pain.[84]

In reference to the films submitted to the court on the date of the hearing, the ALJ asked Ms. White about her recent visit to the chiropractor.[85] Ms. White responded that physical therapy had

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] R. at 52-53.
[78] R. at 53.
[79] *Id.*
[80] *Id.*
[81] R at 53-54.
[82] R at 54.
[83] *Id.*
[84] *Id.*
[85] *Id.*

been previously recommended to her, but that she could not afford the treatment and she had no medical insurance or medical card.[86]

When asked what she does during the day, Ms. White explained that she typically sits in a chair or lies in bed watching TV, and sometimes reads magazines or books.[87] She testified that she does not hold her grandchildren because they are too large and heavy, and that she never watches them without her daughter present.[88] Ms. White explained that she plays with them, but cannot hold them.[89]

Ms. White reported that due to her colitis she has diarrhea two times a day, sometimes three, depending on what she eats.[90] When asked why her medical records indicate that her colitis is stable and she has no problems with it, Ms. White stated that it depends on the food she eats, and confirmed that she has to avoid eating certain foods.[91] She explained that depending on what her daughter cooked, she could not always avoid those foods.[92] Ms. White testified that she is able to do a little bit of simple cooking in the microwave.[93]

The ALJ asked Ms. White if she was able to do anything outside of the house, such as visit friends and family or attend church.[94] Ms. White responded that she goes to church.[95] She also stated that she used to do a lot of walking in the park, but has not recently.[96] She testified that now she thinks as far as she can walk is from the front door to the car, and that the car is usually right by the

---

[86] R. at 54-55.
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] R at 56.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*

door.[97] When asked about sitting, Ms. White stated that she can sit for a little while without taking her medications. Ms. White also expressed that she has to take all of her medication to function.[98] The ALJ next asked Ms. White about her ability to lift, recognizing her inability to lift her grandchildren.[99] She responded that she does not usually lift anything.[100] Ms. White testified that she could sometimes use her fingers to button clothing, but that she experiences cramps and knots in her fingers.[101]

Ms. White stated that she is not looking for work.[102] When asked if she tries to help out around the house, she stated that she used to go grocery shopping but no longer goes because she gets very sweaty from all the walking.[103] She indicated that her daughter takes care of most of the grocery shopping.[104]

Ms. White and the ALJ also discussed Ms. White's ability to follow what she watches or reads.[105] Ms. White stated that when she takes her medications, she has no problems and is able to concentrate and follow along.[106] She also stated that she was not aware of any side effects caused by her medication at the time.[107]

The ALJ asked Ms. White about how she feels when in large crowds.[108] Ms. White replied first that it does not bother her too much to be around people.[109] However, after vaguely referencing

---

[97] R. at 57.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] R. at 57-58.
[102] R at 58.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] R at 59.
[108] *Id.*
[109] *Id.*

a recent event in which she was at the store with her daughter, she concluded that she does not like to be in crowds.[110]

Ms. White explained that her most recent part-time work was as a bus monitor.[111] She stated that she enjoyed the work because it was easy and all she had to do was ride the bus with the kids.[112]

Ms. White's attorney, Mr. Horn, then asked some additional questions.[113] Mr. Horn asked Ms. White again about the tramadol and whether there were any side effects.[114] Ms. White responded that she had forgotten before, but sometimes the medicine upset her stomach.[115] Ms. White testified that she lies down during the day, three to four times for about three hours total because her back and legs, particularly the left leg, bother her.[116] Mr. Horn asked Ms. White how long she had been seeing her treating physician, Dr. Rafiq, and she responded that it had been since either 1995 or 1997.[117]

Mr. Horn asked if Ms. White takes any medication for side effects.[118] She responded that she had taken medication in the past for side effects, but was taken off of the medication by Dr. Rafiq because it upset her stomach.[119] Ms. White continued, saying that she started taking medication last year and that Dr. Rafiq had tried to prescribe her this medication again this year, but it continued to upset her stomach.[120] When asked why she gets anxious, Ms. White simply replied that she gets agitated and gave no explanation for why.[121]

---

[110] *Id.*
[111] *Id.*
[112] R. at 59-60.
[113] R. at 60.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] R. at 61.
[119] *Id.*
[120] *Id.*
[121] *Id.*

Ms. White testified that she stopped working full time in either 2008 or 2009 due to health problems.[122] She specified that these problems involved her back, right leg and right hand.[123]

### 2.    The VE's Testimony

Julie Radke, the vocational expert, testified next.[124] She confirmed that she had reviewed the exhibits in Ms. White's file before the hearing.[125] Attorney John Horn stated that he had no objection to Ms. Radke serving as a vocational expert in this case.[126] The ALJ asked the VE if she needed any additional information regarding Ms. White's vocational background before testifying.[127] The VE expressed that the record was unclear about which jobs were full-time and which were part-time.[128] The VE continued, referencing the adult disability form, and listed the following jobs: machine operator for a mailing company from 1993-2008, an unspecified company supervisor position, and multiple positions in nursing homes that appeared to be full-time.[129] The ALJ determined that Ms. White's wages in 1998, 1999, and 2003-2008 were of a Substantial Gainful Activity ("SGA") level.[130] The VE stated that she would focus on those jobs.[131]

The VE described the following jobs as defined by the Dictionary of Occupational Titles.[132] She determined that the school bus monitor position was light and unskilled, and assumed that it was a part-time position.[133] The machine operator position at a mailing company, listed from 1993-2008,

---

[122] *Id.*
[123] R at 62.
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] R. at 62-63.
[129] R. at 63.
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] *Id.*

was also defined as light and unskilled.[134] The VE recognized the cook and supervisory position in a nursing home, but highlighted that Ms. White helped others or watched over the staff for a short duration—only about 20 minutes—until the manager came in.[135] The supervisory position was defined as semiskilled and light as performed by Ms. White.[136] The VE defined Ms. White's job as a home health aid as semiskilled and medium.[137] Finally, she defined Ms. White's job as a security guard as semiskilled and light.[138] The ALJ asked the VE if any of the listed semiskilled jobs would have transferrable skills to other light or sedentary jobs and the VE replied negatively.[139]

The ALJ asked the VE if for the purpose of her hypotheticals she could answer for an individual of Ms. White's age, education and vocational background, and whatever limitations the ALJ might provide.[140] For the first hypothetical, the ALJ asked the VE to include the limitations from the state agency medical opinion.[141] These limitations included being able to perform light exertional work, a need to alternate sitting and standing to relieve pain or discomfort (provided the individual would not be off task more than 10% of the work period), the individual can occasionally climb, and finally, a need to avoid concentrated exposure to extreme cold and concentrated exposure to extreme fumes, dust, gases and poor ventilation.[142] The VE stated that under these assumptions and limitations, out of Ms. White's past work, such an individual could perform her school bus monitor position, the cook position at the nursing home, and the security position.[143] The ALJ asked the VE the number of unexcused absences that might be tolerated by employers cited in this

---

[134] *Id.*
[135] *Id.*
[136] R. at 64.
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] R. at 65.

hypothetical.[144] She replied that a maximum of one absence per month would allow the individual to retain a position.[145]

The VE also stated that there were other positions in the regional and national economies that could accommodate the given restrictions, including the positions of mail clerk, office helper and receptionist.[146] She noted that there are 2,885 mail clerk positions in the northern Illinois, 14-county region, 6,768 office helper positions in that region, and 2,960 receptionist positions in that region.[147]

The ALJ moved to a second hypothetical, one where the individual had the same age, education and vocational background as Ms. White, and the limitations expressed by Ms. White's treating physician, Dr. Rafiq.[148] Those limitations include occasional lifting of no more than twenty pounds, standing and/or walking less than four hours of an eight-hour day, sitting less than four hours of an eight-hour day, no climbing ladders and ropes, occasional pushing and pulling of the hands, pushing and pulling of the feet, only occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling, and occasional reaching, handling and fingering.[149] The VE stated that with those limitations, an individual of Ms. White's age, education and background would be unable to perform any of Ms. White's past work.[150] The VE testified that such a person could do work somewhere between sedentary and light.[151] The VE also noted that Dr. Rafiq's assessment renders Ms. White unable to hold a position with an eight-hour workday.[152]

---

[144] R. at 67.
[145] *Id.*
[146] R. at 65.
[147] *Id.*
[148] *Id.*
[149] R. at 65-66.
[150] R at 66.
[151] *Id.*
[152] *Id.*

Mr. Horn then questioned the VE.[153] Mr. Horn asked the VE if an unscheduled break to lie down due to back pain for even just an hour a day would preclude work, and she answered affirmatively.[154] Mr. Horn also asked if there were any inconsistencies with the Dictionary of Occupational Titles and the VE confirmed there were not.[155] Lastly, Mr. Horn asked if limiting Ms. White to sedentary work would preclude her past work, and the VE said yes.[156] Mr. Horn then suggested that if the ALJ split the difference between Dr. Rafiq's assessment and the state agency assessment, Ms. White would be at a clinical sedentary work level.[157]

Finally, when asked if she would like to add anything, Ms. White testified that she does not enjoy being unemployed and that sitting around doing nothing and being unable to hold her grandchildren hurts her.[158]

## C. The ALJ's Decision

In an opinion issued on November 30, 2011, the ALJ concluded that Ms. White was not disabled within the meaning of the Act at any time after her alleged onset date of January 1, 2010.[159] Although the ALJ decided that Ms. White met the non-disability requirements for disabled widow's benefits under the SSA, she found that Ms. White was capable of performing her past relevant work.[160]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[161] The ALJ's first step is to consider whether the claimant is presently

---

[153] R. at 67.
[154] *Id.*
[155] *Id.*
[156] R. at 68.
[157] R at 68-69.
[158] R at 68.
[159] R. at 24-33.
[160] R. at 27, 31.
[161] 20 C.F.R. § 404.1520(a)(1).

engaged in any substantial gainful activity which would preclude a disability finding.[162] In the present case, the ALJ determined that Ms. White has not engaged in any substantial gainful activity since the alleged onset date of January 1, 2010.[163]

The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[164] In the present case, the ALJ concluded that Ms. White had the medically determinable severe impairments of stable asthma, stable colitis, mild lumbar degenerative disc disease, hypertension, and hyperlipidemia.[165]

The ALJ's third step is to consider whether the claimant's impairments meet or equal any impairment listed in the regulations as being so severe as to preclude gainful activity.[166] In the present case, the ALJ determined that Ms White's impairments did not meet or medically equal an impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.[167] The ALJ considered sections 3.02 and 3.03 of the listings and found that Ms. White's asthma did not meet or equal any of the requirements.[168] The ALJ also considered 1.04 of the listings and concluded that none of the requirements of the musculoskeletal listings have been shown in the record.[169] The ALJ further concluded that Ms. White's hypertension does not meet any of the listings of the cardiovascular system, and that her colitis does not meet the requirements of listing 5.06 on inflammatory bowel disease or any listings for the digestive system.[170]

In the event that none of the claimant's impairments meet the listing requirements, the ALJ

---

[162] 20 C.F.R. § 404.1520(a)(4)(i).
[163] R. at 27.
[164] 20 C.F.R. § 404.1520(a)(4)(ii).
[165] R. at 27.
[166] 20 C.F.R. § 404.1520(a)(4)(iii).
[167] R. at 29.
[168] *Id.*
[169] *Id.*
[170] *Id.*

proceeds to the fourth step of the test: whether the claimant has the residual functional capacity ("RFC") to perform the requirements of her past relevant work.[171] The ALJ must evaluate the claimant's RFC based on the record, the claimant's testimony, and a comparison of the requirements of her past work.[172] The RFC is an assessment of the maximum work-related activities a claimant can perform despite her impairments.[173]

If determining the claimant's RFC requires the ALJ to assess subjective complaints, then the ALJ follows a two-step process.[174] First, the ALJ decides whether there is an underlying medically determinable impairment—an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's symptoms.[175] If such an impairment exists, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's functioning.[176] The ALJ must consider the entire record when making decisions about the credibility of the claimant's subjective complaints.[177] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is not found to be disabled.[178]

In the present case, the ALJ found that Ms. White had the RFC "to perform light work as defined in 20 C.F.R 404.1567(b)" except for "the need for a sit/stand at will option," she could only partake in the "occasional climbing of ladders, ropes, or scaffolds, ramps, or stairs," and Ms. White

---

[171] 20 C.F.R. § 404.1520(a)(4)(iv).
[172] 20 C.F.R. § 404.1520(e).
[173] 20 C.F.R. § 404.1545.
[174] S.S.R. 96-7p.
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] S.S.R. 96-8p.

should "avoid concentrated exposure to cold, environmental irritants, and poorly ventilated areas."[179] In terms of Ms. White's subjective complaints, although the ALJ found that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," she also found that Ms. White's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with her RFC assessment.[180]

In determining Ms. White's credibility, the ALJ found that the record did not support the kind of treatment that would be expected from her subjective complaints.[181] The ALJ specifically noted that Ms. White's impairments were "repeatedly described as mild, stable and controlled," and "tests and studies did not support her allegations."[182] The ALJ also pointed to the inconsistency between Ms. White's statement to the consulting examiner that she had physical therapy, and her denial in her testimony that she had such therapy.[183] The ALJ found it relevant that Ms. White had only recently begun to see a chiropractor, contradicting her complaints of long-term pain and weakness.[184] Overall, the ALJ found that Ms. White's treatment had been "routine and conservative" and "she was not seen or referred by her treating physician to any specialist."[185]

In further support of her credibility finding, the ALJ stated that Ms. White's subjective complaints were not fully credible because she performed normal daily activities such as going to church and cooking, and the ALJ did not believe Ms. White could recline all day with two grandchildren in the house.[186] The ALJ noted that there was no medical evidence in the record that

---

[179] R. at 29.
[180] R. at 30.
[181] Id.
[182] Id.
[183] Id.
[184] Id.
[185] Id.
[186] Id.

suggested Ms. White laid down three hours a day.[187] Finally, the ALJ expressed that Ms. White's

claim that she had diarrhea two or three times a day was contradictory to the medical evidence that

showed Ms. White's colitis was stable.[188]

Turning to the opinion evidence, the ALJ explained that she gave little weight to the opinion

of Dr. Rafiq.[189] The ALJ believed the opinion to be "sympathetic" and "based upon the claimant's

subjective complaints."[190] The ALJ decided Dr. Rafiq's statements were conclusory and inconsistent

with the medical record as a whole, which showed "no support for significant limitations in the

claimant's ability to stand, walk or sit."[191] The ALJ also gave little weight to the argument of the

attorney in his brief of October 1, 2011, because it was based on the opinion of Dr. Rafiq.[192]

However, the ALJ gave considerable weight to the state agency physician, describing her opinion

as "fully supported by the evidence of the record."[193]

The ALJ found that Ms. White was "capable of performing past relevant work as a security

guard, school bus monitor, and cook" and that this work did "not require the performance of

work-related activities precluded by" Ms. White's RFC.[194] In comparing Ms. White's RFC "with

the physical and mental demands of this work," the ALJ found that Ms. White was "able to perform

it as actually and generally performed."[195] In determining this, the ALJ relied on the VE's

testimony.[196] The VE stated that "the claimant's job as a security guard was at a light exertional level

and semiskilled, that her job as a school bus monitor was light unskilled, and that her job as a cook

---

[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*

at a nursing home was light and semiskilled."[197] The VE testified that with the RFC the ALJ has assigned, Ms. White would be able to perform all three jobs.[198]

Finally, though the ALJ found that Ms. White could perform her past relevant work and was thus not disabled within the meaning of the Act, she proceeded to the fifth step for alternative findings regarding whether Ms. White could make a successful adjustment to other work.[199] At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience.[200] If the claimant is able to do other work, she is not disabled.[201] In order to support a finding that an individual is not disabled at this step, the SSA is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do.[202]

Based on the VE's testimony, the ALJ listed positions which Ms. White could easily assume, including a mail clerk with 2,885 jobs in the Chicago metropolitan area, an office helper with 6,768 jobs in the Chicago metropolitan area, and a receptionist with 2,960 jobs in the Chicago metropolitan area.[203] Assessing Ms. White's age, education, work experience, and RFC, the ALJ concluded that she was capable of performing other work that existed in significant numbers and, thus, was not disabled under the framework of Medical Vocational Guidelines section 202.14.[204]

## III.    Standard of Review

The Court must sustain the Commissioner's findings of fact if they are supported by

---

[197] *Id.*
[198] *Id.*
[199] *Id.*
[200] 20 C.F.R. § 404.1520(g).
[201] *Id.*
[202] 20 C.F.R. §§ 404.1512(g) and 404.1560(c).
[203] R. at 32.
[204] *Id.*

substantial evidence and are free of legal error.[205] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[206] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[207] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[208] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build a logical bridge from the evidence to his conclusions.[209] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or if the Commissioner applied an erroneous legal standard.[210]

## IV.    Analysis

Ms. White argues that the Court should reverse and remand the decision of the ALJ because the ALJ failed to: (1) properly evaluate her credibility; (2) give appropriate weight to opinions from both her treating physician and chiropractor in the RFC assessment; and (3) obtain a medical source statement ("MSS") from the consultative examiner, which denied her right to equal protection and due process. We find no error on the part of the ALJ with respect to each of these arguments. Overall, we determine that the ALJ constructed a logical bridge from the record to her conclusions and that she provided adequate support for her arguments.

---

[205] 42. U.S.C. § 405(g).

[206] *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009)).

[207] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).

[208] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

[209] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

[210] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

### A.     The ALJ's Credibility Determination

First, Ms. White contends that the ALJ's credibility determination was erroneous. Specifically, Ms. White argues that the ALJ erred by improperly: (1) relying on Ms. White's history of routine and conservative treatment; and (2) rejecting her testimony because it was inconsistent with objective medical evidence. Ms. White also points to the ALJ's use of boilerplate language and how such language implies that the ALJ determined Ms. White's RFC before assessing her credibility. However, because the Seventh Circuit has not remanded cases just for the use of such language,[211] we will not further address this point.

An ALJ's credibility determination cannot be invalidated unless it is "patently wrong."[212] In determining whether a credibility determination is "patently wrong," the court examines whether the ALJ's determination was reasoned and supported.[213] The Seventh Circuit explained that an ALJ needs only to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability."[214] "It is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be 'patently wrong.'"[215] Additionally, when determining credibility, an ALJ must consider the entire case record, including the claimant's statements and the opinions of treating or examining physicians and other persons.[216] Under S.S.R. 96-7p, an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the

---

[211] *See, e.g.*, *Carter v. Astrue*, 413 F. App'x 899, 905-06 (7th Cir. 2011) (refusing to remand simply because of the inclusion of a template credibility finding and holding that the ALJ provided an adequate explanation for his credibility finding).

[212] *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2008); *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).

[213] *See Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

[214] *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

[215] *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (quoting *Jens*, 347 F.3d at 213).

[216] S.S.R. 96–7p.

evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[217] Finally, in determining the claimant's credibility, the ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by objective medical evidence.[218]

### 1. History of Conservative and Routine Treatment

Ms. White argues that the ALJ erred in making her credibility determination by finding that she has not had sufficient treatment.[219] The Commissioner responds that the ALJ reasonably found that Ms. White's lack of ongoing treatment was inconsistent with her subjective claims regarding the extent of her impairments. We agree with the Commissioner.

Ms. White argues that the ALJ cannot determine what is sufficient treatment if the record is devoid of any evidence that she could return to work were she to obtain such treatment. However, the standard Ms. White states is inaccurate. The regulations allow an ALJ to consider a claimant's treatment regiment in comparison to their claimed limitations,[220] and this Court is "required to give deference to the ALJ's factual determination stemming from that history."[221] An ALJ may find that a claimant's failure to seek regular or appropriate treatment detracts from her credibility,[222] whether or not that individual could return to work if they obtained such treatment.

Ms. White further argues that the ALJ improperly determined her treatment was insufficient to match her complaints because Ms. White testified that she does not have medical insurance or a

---

[217] *Id.*
[218] *Id.*
[219] R. at 30.
[220] 20 C.F.R. § 404.1529(c)(3)(v).
[221] *Jones v. Astrue*, No. 11 CV 3958, 2012 WL 4120417 at *8 (N.D. Ill. Sept. 18, 2012).
[222] *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

medical card. It is true that the ALJ should "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment."[223] But it appears that the ALJ did consider these factors in her analysis.

In describing the facts of the case, the ALJ specifically mentions Ms. White's testimony about having been recommended physical therapy but being unable to afford it, and Ms. White's statements that she had no medical insurance or medical card.[224] And as the Commissioner points out, the record shows that Ms. White saw and consulted her treating physician regularly despite not having medical insurance. Further, the ALJ describes in her credibility determination that most of Ms. White's visits to Dr. Rafiq did not reflect more than mild problems or complaints.[225] The ALJ also supports her conclusion with the fact that Dr. Rafiq never referred Ms. White to a specialist, Ms. White gave conflicting statements about whether or not she had ever been to a physical therapist, there was no evidence in the record of any kind of physical or rehabilitative therapy, and the first time Ms. White saw a chiropractor was only a month before the hearing.[226]

From the Court's perspective, though Ms. White had limited funds and no medical insurance, the ALJ had sufficient evidence beyond Ms. White's financial means to support why her care had been routine and conservative. It was reasonable for the ALJ to find that such treatment undermined Ms. White's claims of disabling impairments.

### 2. Testimony Inconsistent with Objective Medical Evidence

---

[223] S.S.R. 96-7p.

[224] R. at 28-29.

[225] *See* R. at 308 (routine visit), 310-14 (laceration), 319-20 (twitching in the right eye), 325 (routine visit), 353 (routine screening and complaint of a cold).

[226] R. at 30.

Ms. White also argues that the ALJ placed too much weight on the lack of objective medical evidence in support of Ms. White's subjective claims. She states that her allegations of pain and symptoms cannot be rejected only because of a lack of objective medical evidence. Ms. White then cites to *Carradine v. Barnhart*[227] in support of this assertion. But we cannot see how the case is relevant to her argument. *Carradine* involves a claimant whose pain had psychological origins, which supported the idea that doctors could not find objective medical reasons for her pain.[228] Such is not the case here.

Ms. White's pain is not psychological, and the ALJ's assertion that her allegations of pain and disability are not supported by objective medical evidence is grounded in the record. The ALJ noted that Ms. White's visits to her doctors were routine, and she often had no complaints and displayed no abnormalities.[229] The ALJ also found it difficult to believe Ms. White laid down three hours every day when she had two young grandchildren in the house and no objective medical evidence supported her testimony on the need for that kind of extended rest.[230] The ALJ also referenced the x-ray of Ms. White's lumbar spine which showed minimal problems,[231] and described how Ms. White's impairments were regularly referred to as mild, stable and controlled.[232]

Ms. White specifically took issue with the ALJ's determination that Ms. White likely did not experience diarrhea two to three times per day because the record showed her colitis was stable. Ms. White argues that stable does not mean asymptomatic, and actually means unchanged (*i.e.* that she has consistently had diarrhea two or three times per day). However, Ms. White confuses the doctors'

---

[227] 360 F.3d 751, 754-56 (7th. Cir. 2004).
[228] *Id.*
[229] R. at 30 (citing R. at 293 (routine visit and complaint of arthritic pains), 301-02 (no complaints), 308-09 (routine visit with no acute distress), 350-51 (follow-up visit)).
[230] R. at 30.
[231] R. at 30, 277.
[232] *See, e.g.*, R. at 256, 269, 293.

reports about her colitis with the ALJ's description. The Commissioner points out that it was the ALJ who used the term "stable" to characterize Ms. White's colitis, not Ms. White's doctors. The ALJ described Ms. White's colitis as stable because her doctors regularly referred to her colitis and gastrointestinal problems as "benign,"[233] and there are no instances in the record where Ms. White complained to her doctors of diarrhea or other active gastrointestinal problems. The ALJ even asked Ms. White about her colitis at the hearing, describing to her the inconsistency between the medical records and her claim that she had diarrhea two to three times a day.[234] Ms White replied that it depends on what she eats and that she has to avoid certain foods,[235] implying that her diet directly affects her colitis.

Most importantly, Ms White seems to be arguing that an ALJ cannot *only* look at a lack of objective medical evidence in deciding a claimant is not credible. But the ALJ supplied several reasons for her credibility determination outside of those related to the specific medical evidence. Discussed above, the ALJ found it relevant that Ms. White's care was routine and conservative.[236] Additionally, the ALJ pointed to the discrepancy between Ms. White's statement to the consulting examiner that she had physical therapy in the past and her denial of physical therapy during testimony.[237] Finally, the ALJ noted that Ms. White performed normal daily activities such as going to church and cooking.[238]

The ALJ appropriately articulated her reasoning for determining that Ms. White's statements regarding the extent of her pain and symptoms were not credible. We, therefore, find the ALJ's

---

[233] *See* R. at 256, 302, 305, 309, 336.
[234] R. at 55-56.
[235] R. at 56.
[236] R. at 30.
[237] *Id.*
[238] *Id.*

credibility determination is not patently wrong, and must be upheld.

**B.      The ALJ's RFC Analysis**

Ms. White argues that the ALJ improperly assessed her RFC when she: (1) rejected the opinion of her treating physician, Dr. Rafiq, and (2) failed to give proper weight to her chiropractor's assessment. We find that the ALJ properly discredited Dr. Rafiq's opinion and that while the ALJ did err in assessing the chiropractor's opinion, the error was harmless and would not warrant remand for the reasons we explain.

**1.      The Opinion of Ms. White's Treating Physician**

Ms. White argues that the ALJ improperly rejected the opinion of her treating internist, Dr. Rafiq, because his opinion was supported by medical evidence and was not inconsistent with other substantial evidence in the record. However, the Commissioner contends that Dr. Rafiq's opinion was inconsistent with not only other evidence in the record, but also his own treatment notes, warranting the ALJ's decision to give Dr. Rafiq's opinion little weight.

Generally, the claimant's treating physician is given more weight, but the opinion will only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the medical record."[239] The ALJ will determine which treating and examining doctors' opinions should receive weight, and in doing so, she must explain the reasons for her findings.[240] If the ALJ decides not to assign controlling weight to the treating physician, she will consider factors such as length of treatment, nature of treatment, supportability, consistency, specialization, and additional factors to

---

[239]20 C.F.R § 404.1527(c); S.S.R. 96-5p; *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (finding that the treating physician's evidence is no longer entitled to controlling weight once well-supported contradicting evidence is introduced).
[240]20 C.F.R §§ 404.1527(d) and (f), 416.927(d) and (f); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

determine how much weight to allocate to the opinion of each physician.[241] The ALJ must articulate why particular statements or reports are necessarily inconsistent.[242]

In this case, the ALJ proffered two main reasons for giving Dr. Rafiq's opinion "little weight" as opposed to controlling weight.[243] First, the ALJ found that Dr. Rafiq's opinion was based on Ms. White's subjective complaints and was unsupported by his own objective clinical and laboratory findings.[244] The Commissioner points out that while Dr. Rafiq's opinion placed considerable restrictions on Ms. White's ability to sit, stand and walk, "his treatment notes reflected that [Ms.] White generally came to see him for routine visits or visits on matters unrelated to her alleged disability."[245] Additionally, the ALJ noted that most of Dr. Rafiq's examination notes expressed that Ms. White showed no abnormalities, had only mild problems, or had no complaints at all.[246] With little explanation from Dr. Rafiq for his opinion and without medical evidence from Ms. White's visits with him to support it, the ALJ's determination that his opinion was based on Ms. White's subjective complaints is reasonable. Ms. White provides no counter argument to this reasoning from the ALJ or the Commissioner's argument and, indeed, it is "[t]he Commissioner, not a doctor selected by a patient to treat her, [who] decides whether a claimant is disabled."[247]

Second, the ALJ found that the "evidence as a whole shows no support for significant

---

[241] 20 C.F.R § 404.1527(c).

[242] *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (explaining that in order to adequately articulate her reasoning for discounting a treating physician's opinion, the ALJ must explain why the treating physician's statements were inconsistent with others in the record).

[243] R at 31.

[244] *Id.*

[245] R. at 27-28 (ALJ describing Ms. White's numerous visits to Dr. Rafiq); *see* R. at 269 (complaints of chest pain), 308 (routine visit), 310-14 (laceration), 319-20 (twitching in the right eye), 325 (routine visit), 353 (routine screening and complaint of a cold).

[246] R. at 27-28 (ALJ describing Ms. White's numerous visits to Dr. Rafiq); *see e.g.* R. at 256 (complaints of lower back pain and cold for a few days), 269 (complaints of chest pain), 301-02 (no complaints), 304 (no complaints), 309 (no acute distress, ailments described as controlled and stable).

[247] *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); 20 C.F.R.§ 404.1527(d)(2).

limitations in the claimant's ability to stand, walk or sit."[248] Ms. White argues that Dr. Rafiq's opinion is supported by the consultative examination of January 27, 2011, which found reduced range of motion in the lumbar spine, hips and knees, and difficulty walking on heels and toes. We do not see how the results of the consultative examination are fully supportive of the significant limitations Dr. Rafiq's opinion placed on Ms. White's abilities. Without more information, notes that only describe reduced range of motion and difficulty walking on heels and toes do not translate to a requirement that Ms. White can only stand and walk less than four hours of an eight hour day and sit less than four hours of an eight hour day.

Ms. White also argues that the observations of her chiropractor support Dr. Rafiq's opinion. Again, while the chiropractor's notes indicate lower back pain and cervical spine pain and recommend a four-week treatment plan, without more it does not support Dr. Rafiq's particular restrictions. There was also a questionnaire at the end of the chiropractor's notes that Ms. White filled out herself. While there was initially some confusion regarding this questionnaire that we will discuss in the next section, because the observations from the assessment were Ms. White's own, the ALJ was not in error in failing to address them.[249]

The ALJ's reasoning is sufficient: that she did not give the opinion of Dr. Rafiq controlling weight because his opinion is inconsistent with his own treatment notes and the rest of the medical record, including the chiropractor's opinion. Thus, we conclude that the ALJ's decision to give Dr. Rafiq's opinion little weight was supported by substantial evidence, and the ALJ created the necessary "logical bridge" connecting the evidence with her conclusion.**[250]**

---

[248] R. at 31.
[249] *See* R. at 28, 348-49.
[250] *See Jones*, 623 F.3d at 1160 ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions").

### 2.    The Chiropractor's Assessment

Ms. White additionally argues that the ALJ failed to give proper weight to the chiropractor's assessment because despite mentioning the chiropractor's evidence in her decision, she never indicated what weight, if any, she gave it. The Commissioner responds that what we have from the chiropractor in the record is not an opinion at all, and the ALJ was not required to consider it. While we do believe the ALJ should have explained whether or not she took the chiropractor's assessment into consideration, we find that the error is harmless.

Under 20 C.F.R. § 404.1513, outside of acceptable medical sources, an ALJ may consider evidence from other medical sources such as chiropractors.[251] "Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources.'"[252] The ALJ generally should explain the weight given to opinions from such sources, or "otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."[253]

There was much confusion regarding the evidence from the chiropractor and whether it was the chiropractor or Ms. White who filled out certain pages. The ALJ in her opinion seemed to think that the chiropractor had filled out, on behalf of Ms. White, the questionnaire that appears at the end of the report.[254] In her first brief, Ms. White agreed with the ALJ's conclusion and attempted to argue that the chiropractor's statements in the questionnaire were supportive of Dr. Rafiq's opinion.

---

[251] 20 C.F.R. § 404.1513(d).
[252] S.S.R. 06-03p.
[253] *Id.*
[254] R. at 28 (citing R. at 348)

However, in her reply brief, Ms. White changed her tune and admitted that she had, in fact, filled out the questionnaire and only the other pages in the report were filled out by the chiropractor.

Despite the confusion on both sides, we have determined that it is likely the physician evaluation and treatment plan, the report that follows, and the patient history were all completed by the chiropractor.[255] In contrast, Ms. White filled out the questionnaire at the end of the chiropractic records as a self-assessment.[256] Though the Commissioner argues that even the pages filled out by the Chiropractor do not constitute an opinion and, thus, the ALJ need not have considered it, he cites no law to support this claim. Nonetheless, despite the Commissioner's incorrect contention, we do not feel the ALJ's failure to discuss the weight given to the chiropractor report warrants remand.

The reviewing court is not permitted to upset the agency's decision if a discovered error is deemed to be harmless.[257] "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record," then the error is harmless and it is inappropriate to remand.[258]

While it would have been helpful and appropriate for the ALJ to explain any weight she gave to the chiropractor's report instead of just describing the contents of the report, we do not believe it would change the outcome of this case had the ALJ done so. Ms. White takes issue with the fact that the ALJ did not use the criteria in C.F.R. § 404.1527(c) to evaluate the report. The factors an ALJ should consider include how long the source has known, and how frequently the source has seen, the individual, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion,

---

[255] *See* R. at 342-47.
[256] *See* R. at 348-49.
[257] *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006).
[258] *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

whether the source has a specialty or area of expertise related to the individual's impairment(s), and any other factors that tend to support or refute the opinion.[259]

While we do not know what weight the ALJ would have given to the chiropractor's opinion, in considering the above factors we conclude that the chiropractor's report was consistent with opinions the ALJ had already adopted. In the record we have only Ms. White's initial screening examination with the chiropractor to evaluate. Ms. White had no treatment history with the chiropractor except for that first meeting. At the initial screening, the chiropractor gave a diagnosis of lower back pain and pain in the cervical spine and found that Ms. White had some limits in her range of motion.[260] This diagnosis is consistent with the opinion of Dr. Patil, which noted that Ms. White was impaired by degenerative disc disease and had some limits in the range of motion of her lower back, hips and knees.[261] The ALJ accommodated these range of motion limits in her RFC assessment by adopting Dr. Pilapil's opinion.[262]

Ms. White argues that the treatment plan submitted by the chiropractor, which recommended visits several times per week for four weeks for therapy, manipulation, and other treatment,[263] diagnosed further problems with Ms. White that the ALJ should have considered. However, the treatment goals Ms. White is concerned with are simply checked boxes on the evaluation and treatment plan. It should be noted that the chiropractor checked every single box available under the treatment goals section of the plan, including the goals to "[d]ecrease pain," "[d]ecrease spasm," "[d]ecrease swelling," "[i]ncrease strength," "[r]estore structural integrity," and "[d]ecrease fibrosis

---

[259] 20 C.F.R. § 404.1527(c).
[260] R. at 342-47.
[261] R. at 27.
[262] R. at 31 (citing R. at 279-86).
[263] R. at 342.

of repair."[264] We cannot assume from the treatment goals alone that the chiropractor was trying to diagnose additional pain, spasm, swelling, or any particular problem, especially because such issues are not listed in the chiropractor's preliminary diagnoses. Two of the factors to consider are the degree to which the source presents relevant evidence to support an opinion, and how well the source explains the opinion.[265] There are no notes giving additional information on why the chiropractor chose the treatment goals he did and no other medical evidence to support his recommendations. Ms. White argues that these treatment goals are in line with Dr. Rafiq's opinion, but the ALJ properly discredited that opinion.

Finally, Ms. White cites frequently to *Johnson v. Astrue* for the contention that we must remand the case because the ALJ ignored the chiropractor's opinion and examination results.[266] However, in *Johnson* the claimant had a consistent, ongoing relationship with his chiropractor that is not found here.[267] Ms. White saw her chiropractor only once. Also, despite the ALJ's determination in *Johnson* that the chiropractor's opinion was inconsistent with that of two treating physicians, the court deemed that the chiropractor's opinion was consistent with those of the treating physicians.[268] Here, we have found that the chiropractor's opinion is consistent with both the opinions adopted by the ALJ, that of Dr. Pilapil and Dr. Patil.

Therefore, despite the ALJ's error in discussing the chiropractor's opinion, we cannot remand a case where we are reasonably certain the outcome would be the same if the error was corrected.[269] Thus, we must uphold the ALJ's RFC analysis.

---

[264] *Id.*
[265] 20 C.F.R. § 404.1527(c).
[266] No. 11 C 3989, 2012 WL 3205039 at *10-11 (N.D. Ill. Aug. 2, 2012).
[267] *Id.*
[268] *Id.*
[269] *See Spiva*, 628 F.3d at 353.

### C.  The ALJ's Decision Not to Obtain a Medical Source Statement from the Consultative Examiner

Ms. White's final argument is that the ALJ's failure to obtain a medical source statement from the consultative examiner, or have him testify, denied her right to equal protection, due process, and, somehow, interstate travel. Ms. White's support for this argument comes from her contention that claimants in Arizona and Tennessee allegedly receive medical source statements from consultative examiners, so claimants in Illinois must as well.

As the Commissioner correctly points out, controlling S.S.R. regulations state that although a medical source statement is usually requested, "the absence of such a statement in a consultative examination report will not make the report incomplete."[270] Ms. White cites to the POMS handbook for SSA employees in support of her claim that medical source statements are required, but the handbook specifically says that the absence of a medical source statement does not render the report incomplete.[271] It follows that neither the POMS nor the regulations impose a duty to obtain a medical source statement if the consultative examiner's report does not include one.

Further, we do not believe that the lack of a medical source statement amounts to a constitutional violation. Ms. White herself points out that the Seventh Circuit rejected her reasoning on this issue in *Dornseif v. Astrue*, but argues that this case is distinguishable because here the issue was presented to the ALJ before the hearing, as opposed to being raised for the first time in front of the Appeals Council in *Dornseif*. We disagree. The Seventh Circuit reasoned that "the examples cited by Dornseif fall short of showing that the Commissioner's practice is unlawfully discriminatory," and that is still true in the case of Ms. White.[272] In fact, the Commissioner counters

---

[270] 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6).
[271] POMS 22510.015(B)(2).
[272] No. 12-2408, Slip Opinion at 4 (Nonprecedential disposition) (7th Cir. Jan. 15, 2013).

Ms. White's claims with an official SSA report that provides a statistical evaluation of administrative appeals at the state agency and hearing level. The report shows that Illinois approves a higher percentage of claims at the initial and reconsideration levels than either Arizona or Tennessee.[273] This suggests that Illinois residents are not disadvantaged compared to residents in those states. We, therefore, find that the decision not to order a medical source statement was entirely supported by the regulations and did not infringe on Ms. White's equal protection rights.

## V.     Conclusion

For the reasons outlined, Ms. White's motion for summary judgment [dkt. 14] is denied, and the Commissioner's motion for summary judgment [dkt. 22] is affirmed.


**IT IS SO ORDERED.**

**ENTERED:** August 13, 2013                    _____

                                                **UNITED STATES MAGISTRATE JUDGE**

                                                **Susan E. Cox**

---

[273] Social Security Advisory Board, *Aspects of Disability Decision Making: Data and Materials* (February 2012); http://www.ssab.gov/Publications/Disability/GPO_Chartbook_FINAL_05212012.pdf.